AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Original

FILED
CLERK, U.S. DISTRICT COURT
10/14/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: GSA DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

NATHAN YOUNG, aka "Pablo",
DAVID YOUNG, aka "Sancho Lopez,",

Defendant(s)

Case No. 2:26-mj-05996-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of June 12, 2023, in the County of Los Angeles in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1347 | Health care fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Daniel Frey*
*Complainant's signature*

Daniel Frey, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: October 14, 2026

Patricia Donahue
*Judge's signature*

City and state: Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSA: Haoxiaohan Cai (x0762)

## Table of Contents


I. INTRODUCTION.............................................. 1

II. PURPOSE OF AFFIDAVIT...................................... 1

III. SUMMARY OF PROBABLE CAUSE................................ 2

IV. STATEMENT OF PROBABLE CAUSE............................... 3

A. RELEVANT INDIVIDUALS AND ENTITIES.....................3

B. SUBSTANCE ABUSE TREATMENT AND INSURANCE COVERAGE......5

C. THE HEALTH CARE FRAUD SCHEME..........................8

1. Overview...................................8

2. Recruitment of Patients and Fraudulent Enrollment in Insurance Policies...........11

3. Trafficking of Patients to the Young Facilities to Receive Sham Treatment.......18

4. Provision of Kickbacks to Keep Patients at the Young Facilities as Long as Possible...28

5. Submission of Claims.......................32

V. CONCLUSION................................................ 32

# AFFIDAVIT

I, Daniel Frey, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent with the United States Department of Justice, Federal Bureau of Investigation and have been so employed since February 2023. I am currently assigned to the FBI Los Angeles Field Office. As a Special Agent, I have received hundreds of hours of formal and informal training in the enforcement of federal laws and regulations, including training through the FBI Academy at Quantico, Virginia. Through working for the FBI, I have conducted investigations into health care fraud and kickbacks, including in the substance abuse treatment industry. In conducting these investigations, I have used a variety of investigative techniques, including use of social media to identify those engaging in health care fraud and kickbacks.

## II. PURPOSE OF AFFIDAVIT

2. This affidavit is made in support of a criminal complaint against, and arrest warrants for NATHAN YOUNG ("NATHAN") and DAVID YOUNG ("DAVID") (together, "the YOUNGs") for committing a violation of 18 U.S.C. § 1347 (health care fraud).

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint and arrest warrants and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

4. I am investigating this case with other law enforcement officers, including Special Agent Clayton Flacker with the Internal Revenue Service, Criminal Investigations ("IRS-CI"), and Diversion Investigator ("DI") Annel Peraldi with the Drug Enforcement Administration. The facts set forth in this affidavit are based upon my personal observations, my training and experience, the review of documents and records that were collected during this investigation, information that was obtained from interviewed witnesses, and information obtained and relayed to me by IRS-CI Special Agent Flacker and DI Peraldi, other members of the investigative team, and others as described below.

## III. SUMMARY OF PROBABLE CAUSE

5. Beginning no later than in or around May 2020, and continuing through the present, NATHAN, DAVID, and others established dozens of separate entities that purported to provide a range of clinical treatment to individuals suffering from substance use disorders such as drug and alcohol addiction (together the "Young Facilities" or "Facilities").

6. NATHAN, DAVID, and their co-conspirators, through the Facilities, engaged in a wide variety of fraudulent and illegal practices that pervaded their business, including submitting fraudulent health insurance applications to insurers on behalf of prospective patients, providing patients with illegal drugs to maintain their addiction so that they cycled through the Young Facilities for as long and as many times as possible, billing for non-existent and woefully inadequate "therapy" sessions, and giving patients financial inducements in exchange for enrolling with and remaining at the Young Facilities, often referred to as "patient brokering," or "body brokering." The Facilities have collectively submitted over $1.6 billion in claims to major private health insurers for detoxification and substance abuse treatments, and were paid over $210 million.

7. Evidence gathered during this investigation, including from the YOUNGs' emails, text messages, and communications with co-conspirators, as well as insurance claims data, bank records, interviews of former employees, a cooperating witness, and patients of the Facilities, support that NATHAN and DAVID perpetrated this fraudulent scheme.

## IV. STATEMENT OF PROBABLE CAUSE

8. Based on my review of the evidence described in paragraph 7, law enforcement reports, other documents, and my own participation in the investigation, I am aware of the following facts and information.

### A. RELEVANT INDIVIDUALS AND ENTITIES

9. NATHAN, also known as ("aka") "Pablo," was a resident of Los Angeles County, California.

10. DAVID, aka "Sancho Lopez," was a resident of Los Angeles County, California.

11. Broker 1 and Broker 2 were "body brokers" employed by NATHAN and DAVID who referred patients, either directly or indirectly through other brokers, to clinical treatment facilities, including the Young Facilities.

12. Cooperating Witness 1[1] was a former worker at several of the Young Facilities. Cooperating Witness 1 was also a body broker on behalf of NATHAN and DAVID. Cooperating Witness 1 agreed to be listed as an officer and/or nominee owner of several Young Facilities in order to help NATHAN and DAVID obscure their association with these facilities.

13. Based on California Secretary of State records, interviews with former employees, including Cooperating Witness 1, and email communications, I understand that NATHAN and DAVID owned and/or controlled dozens of clinical treatment facilities within the Central District of California purporting to treat individuals suffering from substance use disorders, including, but not limited to, Helping Hands Rehabilitation Clinic Inc., Get Real Recovery, Inc., Rodeo Recovery LLC, Ocean Valley

[1] In August 2025, Cooperating Witness 1 was charged in this district with body brokering conduct. Cooperating Witness 1 has signed plea agreement and has agreed to plead guilty to a superseding information charging him with one count of conspiracy to commit health care fraud and wire fraud for conduct that mirrors the scheme described herein.

Behavioral Health LLC, Healing Path Detox LLC, Joser Forever LLC, Natural Rest House, Inc., Sunset Rehab LLC, Fremont Rehab LLC, The Kiloby Center for Recovery, Inc. dba The Kiloby Center for Recovery, LLC, Antioch Rehab LLC, Redding Rehab LLC, Corte Madera Rehab LLC, Shasta County Rehab LLC, Elmo Detox LLC, Rocklin Rehab LLC, Sacramento Rehab LLC, Vital Steps Recovery LLC, and La Jolla Rehab LLC.

14. 55 SILVER LLC ("55 SILVER") was a California company of which NATHAN was the sole owner according to California Secretary of State documents.

15. 9 SILVER LLC ("9 SILVER") was California company of which NATHAN was the sole owner according to California Secretary of State documents.

**B. SUBSTANCE ABUSE TREATMENT AND INSURANCE COVERAGE**

16. Based on my training and experience, research, conversations with others, and participation in this investigation, I understand that substance abuse treatment was regulated under state and federal law and was typically provided on a continuum of care including, from most intensive to least intensive, Detoxification ("detox"), Residential Treatment, Partial Hospitalization Programs ("PHP"), Intensive Outpatient Programs ("IOP"), and Outpatient Programs ("OP").

17. The first step in substance abuse treatment could entail a medically supervised withdrawal, often called detoxification, or "detox." Detox was meant for individuals who were still addicted to and using certain controlled substances and/or alcohol. To meet medical necessity requirements for

insurance to pay for detox, patients typically needed to test positive for certain drugs or alcohol use upon admission for treatment. Detox could include the use of medication to help patients withdraw from alcohol or drugs and might take place in a hospital ward, in a specialized inpatient detox unit, or on an outpatient basis with close medical supervision. Because detox often entailed the highest levels of care in the substance abuse treatment context, insurance claims for detox were commensurately higher.

18. After successfully completing detox, patients could receive treatment for their underlying addiction from residential or outpatient treatment facilities, generally progressing from detox to residential, PHP, IOP and/or OP levels of care. A patient could also begin treatment at a lower level of care if medical necessity for detox could not be established for the patient on admission. PHPs were formal substance abuse treatment programs that provided patients with intensive therapy, but without an overnight stay. IOPs had to be overseen by a qualified professional with patients assigned to a formal treatment plan. OPs, also known as aftercare, or continuing care, were outpatient programs in which patients might still receive occasional formal treatment from a treatment facility.

19. Once a patient completed intensive treatment, he or she could temporarily stay in transitional housing, often called “sober homes,” while continuing to receive treatment and support for his or her recovery.

20. Based on interviews with patients and former employees, I understand that Young Facilities purported to provide substance abuse and mental health treatment to a patient population that received health care benefits through insurance plans (the "Insurance Plans") offered by private insurance companies, including Anthem Blue Cross Blue Shield ("Anthem"), Aetna Life Insurance Company, Cigna Health and Life Insurance Company, Cigna Behavioral Health Inc., and UnitedHealthcare ("UHC").[2] The Insurance Plans included plans provided through employers, individual/family plans, and Affordable Care Act ("ACA") plans.

21. ACA Plans were subsidized by a premium tax credit paid for by taxpayers to reduce the cost of health care for certain consumers. Such plans were typically subject to eligibility requirements, meaning that not everyone was qualified to participate in such a plan. Eligibility requirements included, but were not limited to, requirements that the plan participant be a resident of a certain state and have annual income below certain set amounts.

22. The Insurance Plans were "health care benefit programs" as defined in Title 18, United States Code, Section 24(b), and Title 18, United States Code, Section 220(e)(3).

23. Clinical treatment facilities that provided substance abuse treatment and behavioral health services could submit

[2] The Insurance Plans are all health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b).

claims for reimbursement to the private insurance companies that offered the Insurance Plans. Such claims typically were submitted electronically, sometimes through intermediary entities known as "clearinghouses."

24. Under the terms of the Insurance Plans and consistent with state and federal law, the private insurance companies only paid claims (a) for services that were medically necessary, actually rendered, provided as represented in claim submissions, and provided by a properly licensed service provider; and (b) that complied with the terms of the Insurance Plans, including the obligation to pay co-insurance and deductibles.

## C. THE HEALTH CARE FRAUD SCHEME

### 1. Overview

25. Based on interviews with patients, former employees, Cooperating Witness 1, a review of text and email communications, and documentary evidence provided by California Department of Health Care Services ("DHCS"), as well as documents provided by Aetna in connection with their civil lawsuit[3] against the YOUNGs, I understand the following:

26. The scheme operated generally in two parts. On the front end, the YOUNGs used a network of body brokers who traveled to various states and sought out vulnerable

---

[3] Aetna alleged claims of fraud, RICO, RICO conspiracy, among other claims, in Case No. 2:23-CV-096543-MCS-SK (C.D. Cal.). The investigation obtained materials collected by Aetna as part of that lawsuit after issuing investigative process to Aetna.

populations, such as individuals who were unhoused and in poverty and individuals attending substance abuse support groups, to enroll in substance abuse and mental health treatment at the Young Facilities. The YOUNGs lured, and directed Young Facility employees to lure, potential patients into enrolling for substance abuse and mental health treatment at the Young Facilities by offering a variety of illegal kickbacks and other illegal inducements, including money, drugs, free airline flights, free (or nearly-free) accommodations at highly desirable places, including luxury apartments and houses in Southern California, and access to insurance policies and purported substance abuse and mental health treatment at no cost to the patients.[4]

27. On the back end, once patients were enrolled at the Young Facilities, the YOUNGs submitted or caused the submission of false and fraudulent claims to insurance companies for treatment that was medically unnecessary or not provided. For example, at the detox level, the YOUNGs instructed employees to coach incoming patients to fabricate their symptoms during intake so that they would appear eligible for detox services when they presented at the Young Facilities, and to stay longer

[4] This is in violation of federal law. In October 2018, the Eliminating Kickbacks in Recovery Act ("EKRA"), codified at 18 U.S.C. § 220, was enacted into law, and makes it a violation of federal law to pay or solicit remuneration in return for referring individuals to a recovery home or clinical treatment facility. EKRA also makes it illegal to pay an individual in exchange for using the services of recovery home or clinical treatment facility.

in detox when such detox services were not medically necessary, so that the Young Facilities could bill for treatment. The YOUNGs would also cause patients to attend purported therapy sessions conducted remotely on Zoom where no therapy was provided. Often, as many as approximately 100 patients were logged into one Zoom session at a time and patients were not expected to be on camera or to participate in therapy. In fact, no therapy was provided during these Zoom sessions. The YOUNGs would further direct and cause employees to fabricate patient records and take patients out to the movies or other outings and bill the outings as "group therapy."

28. To prevent patients from leaving the Young Facilities and to continue to bill the Insurance Plans for as long as possible, the YOUNGs would create and implement policies for the Young Facilities directing that patients be drugged with medication, cut off from communication with family members, prevented from accessing their belongings, and physically blocked from leaving.

29. To disguise their ownership of the Young Facilities from insurance companies and others, and to cycle patients through an ever-expanding web of Young Facilities, the YOUNGs purchased and opened, either themselves or through others, dozens of substance abuse treatment facilities and sober homes throughout Southern California and elsewhere. I know from a review of the YOUNGs email correspondence that as of March 2025, the YOUNGs had placed at least eighteen of the Young Facilities in the names of nominees designated by the YOUNGs to operate

them. The YOUNGs also opened shell companies[5] and bank accounts for the shell companies to receive transfers of insurance reimbursements from the Young Facilities. Additionally, the YOUNGs placed some of the shell entities in the names of nominee owners to further conceal their ownership and association with the Young Facilities. The YOUNGs also caused nominee owners of some Young Facilities and the shell entities to sign agreements giving NATHAN exclusive access to and control of bank accounts for those entities.

30. As recently as March 2026, NATHAN signed a "Gift and Assignment Agreement," which reflects a purported charitable transfer of approximately 13 Young Facilities to a nonprofit nominally owned by a Young Facility employee.

2. Recruitment of Patients and Fraudulent Enrollment in Insurance Policies

31. A review of Facebook messages obtained via search warrant from an account maintained by two Young Facility body brokers, Broker 1 and Broker 2, showed communications between body brokers and prospective patients, whereby the body brokers would induce patients to attend the Young Facilities with the promise of a variety of illegal kickbacks and inducements, including money, drugs, free airline flights, free (or nearly-free) accommodations at highly desirable places, including luxury apartments and houses in Southern California, and access

1. These include: LEOPOLD GEORGE DUNCAN LLC, HEALING HOUSES A LLC, THOMAS CHARLES COVENTRY LLC, and WITTY PERSONNEL.

to insurance policies and purported substance abuse and mental health treatment at no cost to the patients.

32. Based on witness interviews, bank records and a review of Broker 1 and 2's communications, I understand that Brokers 1 and 2 only brokered patients to the Young Facilities.

33. For example, on August 29, 2021, Broker 1 and Broker 2 sent the following message to a prospective Young Facility patient who was not interested in doing a substance abuse treatment program, reassuring him/her that participation in "therapy" would be minimal; s/he just had to turn on their video camera and then go "lay out on beach":




34. According to bank records, the body brokers' expenses associated with recruiting patients for the Young Facilities,

including patients' travel and related expenses, were paid out of accounts the YOUNGs controlled.

35. The YOUNGs sought patients with high-reimbursing insurance policies and would instruct body brokers, including Broker 1 and Broker 2, to recruit those patients so that the Young Facilities could obtain the maximum available reimbursement for substance abuse treatment from the Insurance Plans.

36. Emails and text messages between NATHAN, DAVID, and Young Facility employees, including Cooperating Witness 1, illustrate their targeting of high-reimbursing policies. For example, in series of text messages between NATHAN and Cooperating Witness 1 using a telephone number that Cooperating Witness 1 identified as NATHAN's phone, NATHAN and Cooperating Witness 1 discussed patients in terms of their insurance plans, and which patients to move in or out of detox based on the anticipated reimbursement rate from the insurance provider. For example, in response to a message from Cooperating Witness 1 advising that "The United girl has decided to come in putting her at rodeo unless you think otherwise," i.e., that Cooperating Witness 1 was going to enroll a female patient with insurance through UnitedHealthcare ("UHC") into Rodeo Recovery, a detox facility, NATHAN responded: "Ok, I think it's a bad policy but sure . . . An Alaska would be 20 times better." Based on the investigation, I understand NATHAN is communicating that the UHC plan for the female patient did not reimburse well for detox, and that NATHAN would have preferred someone with an Alaska

insurance plan. A week later, on March 14, 2023, in response to messages from Cooperating Witness 1 advising that he was moving a different patient into Rodeo Recovery, NATHAN asked: "Is there any room? I guess move out the United." Based on the investigation, I understand NATHAN to be asking Cooperating Witness 1 to de-enroll the female patient with the less-desirable UHC plan from detox in order to make room for a different patient. Cooperating Witness 1 responded back: "Yes I was moving the shitty United back to sober living." This exchange is problematic because I understand from witness interviews, Cooperating Witness 1's statements, and a review of NATHAN's public profile that neither NATHAN nor Cooperating Witness 1 have medical training yet appear to be making medical decisions about patients' level of care (lowering the UHC patient's level of care from detox to sober living) based solely on the profitability of her insurance plan.

37. A review of emails seized from Cooperating Witness 1's email account via search warrant showed that on September 19, 2023, NATHAN, using an email address we have identified as NATHAN's from Yahoo subscriber records, sent an email to Cooperating Witness 1 with the title "Goals," which stated the names of various insurance plans, provided his target of how many individuals should be "signed up" for each kind of plan, and notated which plans were for "natives," or for Native American enrollees.

38. When the body brokers acquired patients who lacked health insurance policies that would pay high reimbursements,

the YOUNGs fraudulently enrolled patients in higher-reimbursing policies, including the Insurance Plans. A review of Facebook messages, witness interviews, and email and text communications between brokers and the YOUNGs, I understand the YOUNGs obtained, or caused their employees to obtain, personally identifiable information from patients and would apply, or caused applications to be submitted on their behalf, for insurance policies, including the Insurance Plans, for which the YOUNGs knew the patients did not qualify or were ineligible.

39. Throughout the course of the scheme, NATHAN and DAVID received numerous advisements that patients were being brokered to the Young Facilities with fraudulently procured insurance policies, including from DHCS. Nevertheless, the YOUNGs continued the practice.

40. For example, on December 19, 2023, DAVID, using an email address that we have identified as DAVID's from Google subscriber records, forwarded to NATHAN via email a report from a Young Facility employee who advised DAVID about several patients with Oklahoma insurance policies, including a patient who claimed that she was given an Oklahoma insurance policy despite never having been there, and being residents of Texas.[6] Specifically, the employee stated a patient claimed "in front of the cameras [at the Young Facility] that 'we (the company)

---

[6] Based on my training and experience and discussions with representatives of Insurance Plans, I know that one of the eligibility requirements for policies specific to certain states is that the insured be a resident of the state at the time of enrollment.

engage in insurance fraud and she has an OK policy but she is from Texas and has never been to OK.'" After receiving this email, the YOUNGs did not apparently direct staff to discontinue billing insurance for these ineligible patients. Instead, despite being notified as of December 19, 2023, that the enumerated patients in the email were not legitimately enrolled in the Oklahoma-based Insurance Plan, the Young Facilities continued to bill the Oklahoma-based Insurance Plan for patient K.A., until May 16, 2024.

41. To enroll patients in the Insurance Plans, the YOUNGs made or caused others, such as their agents Broker 1 and Broker 2, to make false representations to private insurance companies that offered the Insurance Plans, including that patients (a) were residents of the state that the Insurance Plans serviced, (b) were members of Native American tribes, (c) were dependents of other patients with whom they did not have any familial relationship, or (d) in the case of ACA plans, had a legitimate expectation of satisfying the income requirements making them eligible to receive a subsidy and were not enrolled in other health care plans and programs such as Medicaid and local assistance programs.

42. For instance, on January 25, 2023, Broker 1 and Broker 2, using their joint Facebook account, sent messages to an employee and patient of the Young Facilities consisting of at least twelve screenshots showing each step of enrolling a patient, M.F., into an ACA Plan using false representations, including that M.F. was not enrolled in Medicaid. I interviewed

M.F., who stated that s/he was enrolled in Medicaid when s/he was brokered to the Young Facilities in California by Broker 1 and Broker 2 from Juneau, Alaska.

43. On March 12, 2025, I interviewed J.H. and C.H., who stated that a body broker employed by 55 Silver approached them with an offer to enroll in a Young Facility. J.H. and C.H. were told that if they enrolled in the Young Facility, they would get free flights to Los Angeles and would only have to pay $5 in rent per month. The body broker gave them contact information for an insurance broker and instructed J.H. and C.H. to falsely tell the insurance broker that they were homeless and expected to make a certain income. J.H. and C.H. were subsequently signed up for insurance using false personal identifying information and were falsely represented as being Native American.

44. I also interviewed patient A.B. on May 28, 2026. A.B. stated that he was homeless in North Carolina when he contacted a body broker affiliated with the Young Facilities. The body broker told A.B. that his Medicaid policy would not be accepted at the Young Facilities and instructed A.B. to contact another individual to acquire a new insurance policy. A.B. was subsequently provided with a Highmark Delaware insurance policy despite never having lived in or been a resident of Delaware. Email communications show an email from Broker 1 to an email account controlled by DAVID confirming she had purchased a flight for A.B. Bank records show that A.B.'s flight was paid for by an account controlled by NATHAN.

45. Text messages and email exchanges between the YOUNGs and co-conspirators show the YOUNGs tracked incoming patients and allocated them to Young Facilities by Insurance Plan, referring to patients by their policy plan or number, rather than their names.

46. The YOUNGs caused patients to withdraw from Insurance Plans that stopped reimbursing the Young Facilities and would enroll or cause the patients to be fraudulently enrolled in another policy. For example, on March 22, 2025, after NATHAN instructed Cooperating Witness 1 that certain policies were no longer paying out, Cooperating Witness 1 relayed the need to switch insurances to another Young Facility worker: "No more arkansas' or Louisiana's for detox or sober living. Only Wyoming, Hawaii and Florida blues. So any workers with XUK[7] need to be switched."

3. Trafficking of Patients to the Young Facilities to Receive Sham Treatment

47. The YOUNGs arranged for patients who were newly enrolled in the Insurance Plans, but whose eligibility to receive coverage had not yet started, to be kept in "stabilization houses" until the coverage became effective. Based on interviews conducted with former patients, I know that at the "stabilization houses," patients received no supervision or treatment and were able to use drugs and alcohol.

---

[7] I understand from public records and claims data that this may be a reference to a Blue Cross Blue Shield of Louisiana insurance policy.

48. For example, I interviewed K.B., who stated that s/he was given a Blue Cross of Blue Shield of Illinois policy by a Young Facility-affiliated broker, despite being enrolled in Medicaid, and flown out to California to enroll in a Young Facility. After landing in Los Angeles, s/he was taken to a stabilization house, which s/he described as a "trap house" where s/he did not have access to substance abuse treatment despite experiencing withdrawal symptoms.

49. The YOUNGs instructed employees to coach incoming patients to fabricate their symptoms or substance addictions during intake so that they could appear eligible for detox services when they presented at the Young Facilities, and to stay longer in detox when such detox services were not medically necessary, so that the Young Facilities could bill for treatment. Based on interviews with former Young Facility patients, former employees and Cooperating Witness 1, and a review of internal communications between Young Facility employees, I know that, in some instances, patients were encouraged to use drugs or alcohol so that they would not pass a urine drug test and thus appear eligible for detox services.

50. The YOUNGs instructed Cooperating Witness 1 and others to transfer patients from the stabilization houses and the sober living houses to the detox facilities, regardless of whether it was medically necessary. For example, on October 17, 2023, DAVID emailed to Young Facility employees a PowerPoint presentation he prepared, which instructed staff: "If you have empty beds. . . . Fill them asap. . . . Contact the following by

TEXT message whenever there are empty beds and clients are not on the way to fill them. Below that text, DAVID included the phone numbers for Cooperating Witness 1 and Broker 1.

51. The YOUNGs also instructed employees of the Young Facilities to document at intake exaggerated symptoms that the patients purportedly presented with to fraudulently obtain authorization to bill insurance for the maximum number of days in detox. For example, former employees, including Cooperating Witness 1, stated that they were encouraged to document incoming patients' withdrawal scores as high as possible, and to state that patients were consistently craving drugs or alcohol.

52. For example, in an email to Young Facility employees sent on September 18, 2023, DAVID indicated the priority of conditions which made patients eligible for detox: "If medically necessary, listing Alcohol or Benzos will get detox because of possible seizure. Opioids next, and then Cocaine PHP, and lastly Meth."

53. The YOUNGs also caused patients who were sober and did not need detox services to attend purported detox treatment. For example, investigators with the FBI interviewed S.H., a former patient at the Young Facilities who was employed as a "house manager." Despite being sober and not needing substance abuse treatment, S.H. was aware that the YOUNGs were billing his/her insurance for purported treatment, because s/he had to simultaneously log into the group Zoom sessions, which s/he did not have to participate in. S/he stated that s/he had to do very little, if anything, as a house manager, yet received a

regular paycheck. S/he was given an apartment to stay in and a car, paid for by NATHAN. This was because S.H. was viewed by NATHAN and DAVID and Cooperating Witness 1 as a "premium" patient with superior insurance, and analysis of insurance claims data shows that S.H. was one of the top-billed patients across the Young Facilities.

54. On or around March 14, 2023, NATHAN threatened to withdraw all the special privileges that S.H. was receiving if s/he did not agree to go to a detox facility for 30 days. Specifically, S.H. was told by NATHAN that s/he would lose her job and apartment if s/he did not go to detox. S.H.'s account is corroborated by contemporaneous messages between S.H. and Cooperating Witness 1 as well as messages between Cooperating Witness 1 and NATHAN.

55. For example, on March 14, 2023, Cooperating Witness 1 messaged NATHAN, "[S.H.]'s clean??? What do we write for the billing? NATHAN responded, "Either research chemicals or mental health, I don't know."[8] Cooperating Witness 1 then wrote, "[S/he] won't admit to research chemicals or anything else and I'm not quite sure what to do for mental health." NATHAN then wrote, "I guess ask the biller."

56. Claims data shows that S.H. was billed for purported substance abuse treatment for dates of service throughout March 2023. I have confirmed via claims data that the claim below

---

[8] Based on the investigation, I understand "research chemicals" to refer to designer drugs that the co-conspirators believed would not show up in conventional drug test screens.

corresponds to the instance where S.H.'s insurance policy was billed for the above-referenced medically unnecessary and fraudulent treatment at a Young Facility:

| Approx. Date of Claim | Claim No. & Description | Patient | Insurer | Approx. Billed Amount |
|---|---|---|---|---|
| 6/12/2023 | DX4224685201<br><br>Code 0912 - PHP - Opioid Dependence | S.H. | UHC | $2,995.00 |

57. After S.H.'s compulsory detox, s/he returned to work for the Young Facilities and his/her insurance policy continued to be billed for treatment that s/he did not receive or was medically unnecessary, including a claim in June 2023.

58. In another instance, On February 8, 2024, DAVID emailed a list of patients to Cooperating Witness 1, writing: "Any of these good for Detox?"

59. The YOUNGs submitted and caused the submission of false and fraudulent claims to insurance companies for patients attending purported therapy sessions conducted remotely on Zoom where no therapy was provided. Email communications and internal logs maintained by Young Facility employees show that often as many as approximately 100 patients were logged into one Zoom session at a time and patients were not expected to be on camera or to participate in therapy. In fact, no therapy was provided during these Zoom sessions. In many instances, patients were in the Zoom session for between 1-5 minutes.

60. I interviewed K.H. and L.M., former patients and employees of the Young Facilities, who stated that they were brokered by Young Facility-affiliated brokers from Oklahoma to California. They described the group therapy sessions that they were forced to "attend." All patients in the sober living home would log into the meetings on a single cellphone that was placed on the kitchen island while patients went about their day. L.M. stated that s/he did not attend a single Zoom session in the 13 months that s/he attended the program. Patients were told that they had to log into the meeting for 20-30 minutes and submit a one sentence response. L.M. further stated that on one occasion s/he informed NATHAN of their efforts to encourage other patients to find employment while going through treatment, and NATHAN responded stating he preferred that his patients sit on a couch, unemployed, for 9-10 months because this led to a higher relapse rate. Claims data corroborates that K.H.'s and L.M.'s insurance policies were billed for treatment at the Young Facilities by the YOUNGs.

61. I interviewed E.B., a former Young Facility employee and patient. E.B. corroborated that the treatment offered at the Young Facilities consisted of group therapy over Zoom with dozens of other patients logged in simultaneously. E.B. stated that when s/he was a patient, s/he was not expected to participate in the therapy, but would merely have to leave a comment and then would walk away while the call was running on his/her phone. After s/he was hired to work for the Young Facilities, s/he was still expected to log into the Zoom group

therapy sessions. Insurance claims data corroborates that E.B.'s insurance policy was billed for treatment at the Young Facilities by the YOUNGs.

62. Facility staff collected Zoom records after each group therapy session, and also the concurrent chats for the Zoom sessions. As one example, Young Facility employees circulated among themselves an Excel sheet which listed all participants in a Group session at 10:30 AM on June 29, 2024. That list included the names of 181 unique participants, which included mostly patients and several behavioral technicians, as well as the times and duration of their logging on.

63. To further the scheme, the YOUNGs concealed and disguised their actions, including by directing employees to fabricate patient records. For example, the YOUNGs directed employees to take patients to the movies, dinners and other outings, and to document and fraudulently bill those outings as "group therapy."

64. On January 21, 2024, DAVID emailed Young Facility employees, writing, "If you get a difficult client that refuses groups, take them on an outing talk about relevant information and write an experiential for the time they talked about their life experience."

65. Investigators with FBI interviewed J.G., a former clinical employee of the Young Facilities who worked for the YOUNGs for approximately three months in 2021. J.G. stated that she was instructed by DAVID and J.G.'s clinical supervisor to do whatever certain clients with high-reimbursing insurance wanted.

As an example, J.G. would take one patient, H.Y., go-karting, out to dinner, the movies, etc. and falsely represent in the electronic medical records for H.Y. that s/he had been to group therapy. A contemporaneous email from DAVID to another Young Facility employee instructs them to take H.Y. on "7 hours of experiential outings a day." Claims data shows that during this time period, the Young Facilities billed for substance abuse treatment purportedly provided to patient H.Y.

66. The YOUNGs recycled patients through different Young Facilities, including from a lower level of treatment at the sober homes to a higher level of care at a detox facility, to continue billing the Insurance Plans, regardless of whether treatment was medically necessary or actually provided. Based on patient interviews, I received reports that patients whose more lucrative insurance would no longer cover them were kicked out of detox. As an example, in response to a question from Cooperating Witness 1 regarding how to justify placing a certain patient in detox, NATHAN texted: "extreme cravings, or drop him to op [outpatient]." Based on the investigation, I believe NATHAN to be directing Cooperating Witness 1 how to falsely claim the patient had certain symptoms in order to justify detox, and, alternatively, directing the patient to be dropped to a lower level of care. Again, neither NATHAN nor Cooperating Witness 1 had medical training, and nothing in the record suggests that NATHAN had any personal knowledge whether the patient actually had "extreme cravings." As another example, based on patient records, a patient, S.H., was cycled through at

least six separate Young Facilities, including multiple stints in detox.

67. The YOUNGs caused claims to be submitted for treatment of patients at multiple Young Facilities, including facilities that were associated with nominee owners, to make it harder to detect that claims were continuously submitted by entities ultimately controlled by the YOUNGs, and to disguise the fact that these patients were cycled through Young Facilities for months and even years. Data analysis of insurance claims of approximately 22 Young Facilities showed that over 1,600 patients were enrolled in at least 2 Young Facilities, with others being cycled through up to 10 Young Facilities.

68. To prevent patients from leaving the Young Facilities and to continue to bill the Insurance Plans for as long as possible, the YOUNGs created and implemented policies for the Young Facilities directing that patients be drugged with medication, cut off from communication with family members, prevented from accessing their belongings, and physically blocked from leaving.

69. For example, on October 17, 2023, DAVID emailed Young Facility employees a PowerPoint presentation he prepared which instructed staff that, when dealing with patients who tried to leave detox, they should "Have doctor prescribe something to knock the client out," and that the "[e]asiest way to calm down a client is to medicate them:"




70. The same PowerPoint presentation included a slide in which DAVID instructed that staff should "CALL DOCTOR" in the event of an "agitated client" and provided a list of drugs available, including "Benzos - Diazepam, Xanax, Valium, Alprazolam," which DAVID indicated would have an "immediate effect."

71. Text evidence indicates that the YOUNGs understood the doctors' role at the detox was to debilitate clients from leaving. For example, on or about February 10, 2023, in response to a text message from Cooperating Witness 1 informing

him that a patient with Cigna insurance had left the facility against medical advice, NATHAN responded: "I am just surprised they didn't give him sleep meds."

4. Provision of Kickbacks to Keep Patients at the Young Facilities as Long as Possible

72. To retain patients at the Young Facilities, and in exchange for individual patients using the services of the Young Facilities, the YOUNGs offered and paid prospective patients kickbacks and inducements in the form of money, apartments, hotel stays, cars, gift cards, marijuana, cigarettes, controlled substances (including illegal drugs), and other prescription medications. In addition, the YOUNGs paid or arranged for others to pay certain patients' insurance premiums and cost-share, including deductibles and copayments.

73. For example, on January 20, 2023, in response to a text from Cooperating Witness 1 informing him that a premium patient was trying to leave detox so he could smoke marijuana, NATHAN stated that the patient should be given edibles offsite, and that whoever gives the edibles should not be associated with the detox:

[redacted] 1/20/2023, 2:40 AM
[redacted]s freaking out about wanting to smoke and saying he needs to go back to sober living so he can. Doing my best to keep him but he doesn't want anything else but weed

Pablo 2 1/20/2023, 2:43 AM
I would do edibles, offsite

Pablo 2 1/20/2023, 2:43 AM
Weed is not allowed physically on premise, but if he is off premise antique eat an edible, which is legal in the state of California them it's kind of a loophole I think

Pablo 2 1/20/2023, 2:43 AM
I definitely would not have anyone employed at the detox for animals anything to do with the detox the person who gives an edible offsite though

74. Based on witness interviews and the YOUNGs own internal lingo dividing clients between premium vs. non-premium patients, I know the YOUNGs divided patients between so-called "premium" patients with high-reimbursing insurance policies and patients with policies that were not as lucrative. Premium patients would receive kickbacks in the form of luxurious accommodation, stays in hotels and private apartments, and dinners, among other inducements, whereas non-premium patients lived in cramped, unsanitary, crowded, and often derelict housing and had to rely on government assistance for food.

75. The YOUNGs incentivized patients to stay at the Young Facilities by giving them free or nearly-free housing in Southern California. To conceal and disguise the illegal kickbacks to substance abuse patients, the YOUNGs implemented purported cost-sharing policies—referred to as "sliding scale agreements"—that required patients to contribute $5 per month toward their expenses, including rent and airfare. This served

merely as a pretext for compliance. In practice, the YOUNGs did not enforce the signing of these sham agreements, did not collect the nominal monthly payment, and in some cases, told clients that they did not need to pay money to be at the Young Facilities.

76. For instance, on May 3, 2022, apparently in response to a visit by DHCS, DAVID sent workers of the Young Facilities paperwork to be shown the "next time DHCS comes in," including a Promissory Note where the clients purportedly agreed to pay back their transportation costs, including flights and Ubers, on a monthly basis, which for some clients would only be $5, and instructed the workers that "No two clients should have the same amount of dollars on the promissory note."

77. On November 13, 2024, in response to an email informing them that the Young Facilities had received an audit finding and damages letter from Cigna, NATHAN emailed DAVID about the need to fabricate sliding scale agreements: "we need someone to put together the sliding scale agreement for each of these clients and the 5 dollar payments."

78. The YOUNGs incentivized patients to stay at the Young Facilities by causing co-conspirator doctors to prescribe controlled substances to patients, including substances that could themselves be addictive.

79. For example, on March 26, 2021, DAVID sent messages to a Young Facility doctor, instructing him categorically that medical notes for all clients prescribed benzodiazepines must

reflect that the patient has "daily severe anxiety" or "daily severe PTSD."

Young, David [redacted] ◄ 3/26/2021, 1:38 PM
Need a note in Kipu for all RX

Young, David [redacted] ◄ 3/26/2021, 1:39 PM
If any benzos, need note in kipu that they have daily severe anxiety
Or
Daily severe PTSD

Young, David [redacted] ◄ 3/26/2021, 1:40 PM
Thanks!!!!

Dr [redacted] - Psy Doc [redacted] ► 3/26/2021, 2:08 PM
Got it!

80. On April 11, 2021, in response to a message from a worker at a Young Facility stating, "We need a new PA or doctor I'll get that handled within the next day to two days", DAVID wrote: "Need someone aggressive with comfort meds and available 24/7."

81. On September 22, 2021, DAVID wrote in an email to a Young Facility worker that copied NATHAN: "Also, Nate [NATHAN] said maybe we can get another Dr to prescribe Benzos for Opiod abuse, Since Dr [redacted] will not."

82. Based on a review of communications between the YOUNGs and Young Facility employees, patient interviews, interviews of former Young Facility employees, and bank records, the YOUNGs hired current patients as "employees" so that they could disguise the kickbacks they paid as a salary. The YOUNGs often continued to bill these patients' Insurance Plans for purported substance abuse and mental health treatment. These patient-

employees were often tasked with recruiting other patients for the Young Facilities and some of these patient-employees worked as house managers at the Young Facilities and were responsible for overseeing other patients, distributing medication, and administering purported Zoom therapy sessions despite having no training to do so.

83. For example, on February 17, 2023, DAVID sent an email to a Young Facility employee approving payments from accounts controlled by NATHAN and/or DAVID to several employees who were also patients of the Young Facilities, including S.H.

5. Submission of Claims

84. Per claims data obtained from the Insurance Plans, from approximately May 2020 and continuing to at least May 2026, the YOUNGs submitted and caused to be submitted to the Insurance Plans, claims in the approximate amount of $1,619,276,243.

85. As set forth above, during the course of the scheme, the Young Facilities engaged in a pervasive, rampant practice of fraudulent enrollments into Insurance Plans, billing for medically unnecessary or medically deficient services, and billing for patients procured as a result of illegal kickbacks.

86. Based on the claims submitted by the Young Facilities, the Insurance Plans made payments to the Young Facilities in the approximate amount of $210,274,793.

## V. CONCLUSION

87. For all the reasons described above, there is probable cause to believe that in the Central District of California and elsewhere, NATHAN YOUNG and DAVID YOUNG, did knowingly and

willfully execute and willfully caused to be executed a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is United Health Care, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, namely:

| **Approx. Date of Claim** | **Claim No. & Description** | **Patient** | **Insurer** | **Approx. Billed Amount** |
|---|---|---|---|---|
| 6/12/2023 | DX4224685201<br><br>Code 0912 - PHP - Opioid Dependence | S.H. | UHC | $2,995.00 |

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 14th day of October, 2026.

Patricia Donahue

HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE