TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JENNIFER L. WAIER
Chief Assistant United States Attorney
& Chief, Criminal Division
HAOXIAOHAN CAI (Cal. Bar No. 331131)
Assistant United States Attorney
Major Frauds Section
United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-0762
E-mail: haoxiaohan.cai@usdoj.gov

ERIKA V. SUHR
SIOBHAN M. NAMAZI
Trial Attorneys
National Fraud Enforcement Division
U.S. Department of Justice

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED
CLERK, U.S. DISTRICT COURT
10/15/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: asi DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>NATHAN YOUNG, aka "Pablo", and DAVID YOUNG, aka "Sancho Lopez",<br><br>Defendants. | No. 2:26-MJ-05996-DUTY<br><br>GOVERNMENT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DETENTION FOR DEFENDANTS NATHAN YOUNG AND DAVID YOUNG; DECLARATION OF ERIKA V. SUHR; EXHIBITS |

Plaintiff United States of America, by and through its counsel of record, the First Assistant United States Attorney for the Central District of California and Assistant United States Attorney Haoxiaohan Cai, and U.S. Department of Justice Trial Attorneys Erika V. Suhr and Siobhan M. Namazi, hereby submits its Memorandum of Points and Authorities in support of its request detention for

defendants NATHAN YOUNG and DAVID YOUNG in the above-entitled matter based on danger and flight risk.

The government's application is based on the Memorandum of Points and Authorities contained herein, the declaration of Erika V. Suhr and Exhibits A-J[1], the files and records of this case, as well as any other evidence or argument that the Court may wish to consider at the hearing on this request.

Dated: October 13, 2026

Respectfully submitted,

TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney

JENNIFER L. WAIER
Chief Assistant United States Attorney
& Chief, Criminal Division

/s/
HAOXIAOHAN CAI
Assistant United States Attorney

ERIKA V. SUHR
SIOBHAN M. NAMAZI
Trial Attorneys
U.S. Department of Justice

Attorneys for Plaintiff
UNITED STATES OF AMERICA

[1] Exhibits A-J are concurrently filed under seal.

## Table of Contents

MEMORANDUM OF POINTS AND AUTHORITIES....1
I. INTRODUCTION....1
II. ARGUMENT....3
A. Legal Standard....3
B. Defendants Are a Danger to the Community....4
C. Defendants Are a Flight Risk....12
III. CONCLUSION....21

## Table of Authorities

**CASES**

United States v. Winsor, 785 F.2d 755, 757 (9th Cir. 1986)........ 12

United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985).... 12

United States v. Kouyoumdjian, 601 F. Supp. 1506, 1508-10 (C.D. Cal. 1985)................................................................ 12

United States v. Koenig, 912 F.2d 1190, 1192 (9th Cir. 1990)...... 12

United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990)...... 13

United States v. Possino, No. CR 13-00048, 2013 WL 1415108, at *4 (C.D. Cal. Apr. 8, 2013)........................................ 13

United States v. Al-Arian, 280 F. Supp. 2d 1345, 1358 (M.D. Fla. 2003)................................................................ 14

United States v. Koenig, 912 F.2d 1190, 1193 (9th Cir. 1990)...... 14

United States v. Nicherie, CR 04-354-TJH, 2004 WL 7331735, at *5 (C.D. Cal. Apr. 21, 2004)....................................... 16

United States v. Megahed, 519 F. Supp. 2d. 1241, 1244 (M.D. Fla. 2007)................................................................ 16

United States v. Ayvazyan et al., 20-CR-579-SVW (CDCA)......... 16,17

United States v. Mercedes, 254 F.3d 433, 437 (2d Cir. 2001)....... 17

United States v. Dupree, 833 F. Supp. 2d 241, 244-45 (E.D.N.Y. 2011) ................................................................... 18

**STATUTES**

18 U.S.C. § 3142(c)(1)(B)........................................ 11

18 U.S.C. § 3142(e)................................................ 12

18 U.S.C. § 3142(g)............................................. 12,13

18 U.S.C. § 3142(f)................................................ 12

18 U.S.C. § 2113(a),(d)............................................ 14

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

Defendants NATHAN YOUNG and DAVID YOUNG (the "YOUNGS"), are committing the largest known substance abuse treatment fraud scheme in the country. Over the past six years, defendants have submitted and caused to be submitted over $1.6 billion in fraudulent claims to insurance companies for substance abuse treatment that was either not provided or was woefully inadequate. Defendant NATHAN YOUNG, as the owner and operator, and DAVID YOUNG, as the functional Chief Operating Officer, were the largest beneficiaries of the scheme, with over $210 million in fraud proceeds going to accounts controlled by them.

The scheme has not only incurred staggering financial harm, but has also harmed, and is continuing to harm, vulnerable individuals struggling with substance abuse. The complaint alleges that defendants induced people with substance abuse disorders to travel to California from around the country with the false promise of legitimate treatment. In reality, many patients lived in de facto trap houses where they were able to, and encouraged, to maintain their addiction so that the defendants could bill their insurance policies thousands of dollars per day for treatment that was not provided.

The danger defendants pose to the community is ongoing. Over the course of the last year, and as recently as August 2026, defendants opened new substance abuse treatment facilities throughout the country, disguised under the names of nominee owners. Defendants and their co-conspirators continue to target vulnerable victims to

induce them to attend new facilities so that defendants can continue to bill private insurance companies.

Throughout the course of the conspiracy, and accelerating in the past year, defendants NATHAN YOUNG and DAVID YOUNG have placed assets, companies, and bank accounts in the names of nominees, including family members and other uncharged co-conspirators, to make it harder for the government to trace the fraud proceeds to the defendants and to hide the extent of their wealth. In related fraud litigation brought by Aetna[2], defendant NATHAN YOUNG gave misleading testimony under oath attesting that he no longer owned or controlled substance abuse treatment facilities that defendants are still using to presently perpetuate the fraud scheme. (Declaration of Erika V. Suhr ("Suhr Decl."), Ex. B at 3-4). In fact, defendants had transferred the facilities to nominee owners in the wake of the civil lawsuit and the specter of law enforcement investigation and then caused the nominee owners to execute secret contracts DAVID YOUNG had researched and designed to give NATHAN YOUNG complete financial control of the facilities. (See id. Ex. A.).

Defendants face up to a life sentence if convicted of their charges. Both have extensive ties to Israel and defendant DAVID YOUNG was set to board a flight to Israel for the first time in years when he was arrested. Thus, because defendants are a danger to the community and pose a risk of flight, the government requests that the Court order them detained.

---

[2] Aetna Life Insurance Company et al. v. Nathan Samuel Young et al., 2:23-cv-09654-MCS.

## II. ARGUMENT

### A. Legal Standard

The Court must detain a defendant when "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," 18 U.S.C. § 3142(e). Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985); United States v. Kouyoumdjian, 601 F. Supp. 1506, 1508-10 (C.D. Cal. 1985). A finding that pretrial release will not guarantee the appearance of the defendant need only be supported by a preponderance of the evidence. Motamedi, 767 F.2d at 1406. A finding that a defendant is a danger to the community needs to be supported by clear and convincing evidence. 18 U.S.C. § 3142(f). Furthermore, the Ninth Circuit has made clear that economic danger can be a basis for detention. United States v. Reynolds, 956 F.2d 192 (9th Cir. 1992); see also United States v. Possino, No. CR 13-0048-SVW-3 (JEM), 2013 WL 1415108 (C.D. Cal. Apr. 8, 2013); United States v. Cohen, 2010 WL 5387757 (N.D. Cal. Dec. 10, 2010).

The rules concerning admissibility of evidence in criminal trials do not apply to a detention hearing. 18 U.S.C. § 3142(f)(2)(B). The government may proceed in a detention hearing by way of proffer. United States v. Smith, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996) (citing cases). The rationale for permitting detention hearings to proceed by way of proffer is that such hearings are "neither a discovery device for the defense nor a trial on the merits." Smith, 79 F.3d at 1210. "The process that is due is only

that which is required by and proportionate to the purpose of the proceeding." Id. That purpose does not include the right to confront non-testifying government witnesses. See United States v. Accetturo, 783 F.2d 382, 388-89 (3d Cir. 1986).

**B. Defendants Are a Danger to the Community**

1. Defendants Engaged in an Over $1.6 Billion Fraud Scheme

Defendants are responsible for harm perpetrated to thousands of vulnerable patients with substance abuse addictions and for defrauding insurance companies out of over one billion dollars. For the past six years, the YOUNGS have owned and operated over sixty substance abuse treatment facilities throughout California and in other states that have collectively billed private insurance companies over $1.6 billion in fraudulent claims and resulted in significant patient harm.

To effectuate their scheme, defendants targeted places around the country where they knew vulnerable people struggling with substance abuse to congregate, including homeless shelters and encampments, soup kitchens, and Narcotics and Alcoholics Anonymous meetings. They induced patients to travel to California and other states with the false promise of legitimate substance abuse treatment. They offered free flights and housing in Southern California. In reality, patients found themselves living in de facto trap houses where defendants billed their insurance policies thousands of dollars per day for substance abuse treatment that patients did not receive.

Patients were encouraged to relapse or to maintain their addiction to drugs so that defendants could cycle them through as

many rounds of substance abuse treatment as possible. NATHAN YOUNG and DAVID YOUNG directed employees to systematically instruct patients to break their sobriety or lie about their substance abuse history and symptoms so that defendants could bill their insurance policies for detox treatment.

Defendants ensured that both illegal and medically unnecessary controlled drugs were prevalent at the Young Facilities. Defendants themselves provided marijuana to patients as an incentive to keep them at the facilities. The YOUNGS instructed employees to <u>sedate</u> patients who tried to leave "against medical advice", as set forth in the below training slide:




Thus, contrary to their stated mission, the defendants created an environment of rampant drug abuse to line their own pockets. They terminated legitimate medical practitioners and staff who refused to prescribe against their medical knowledge and sought doctors and psychiatrists willing to prescribe at their direction and that of their employees. These prescribers input fabricated diagnosis into

medical records, irrespective of medical examinations, and were expected to prescribe liberally and immediately. The defendants, who were familiar with the addictive and sedating qualities of the drugs in question, as well as the vulnerability of the client population, nonetheless ensured the prescribers supplied the facilities with an ample stock of scheduled drugs.

Communications, prescription records, interviews, and reports of overdoses show the defendants paid prescribers who were willing to issue prescriptions for no legitimate medical purpose. So-called "premium patients" with the high-reimbursing insurance policies were able to request medically unnecessary controlled drugs. For instance, the YOUNGs directed doctors to prescribe medically unnecessary opioid detox medications, such as buprenorphine, a controlled substance, upon entry into the Young Facilities. As a result, some patients left the Young Facilities with substance abuse addictions that they did not have when they went in, and others overdosed within the facilities.[3]

Premium patients received drugs, apartments, cars, and other perks and were allowed to self-select out of detox. Other patients with less lucrative insurance policies lived in cramped squalor without food and adequate medical treatment. Many patients worked at the facilities while receiving treatment themselves, overseeing other patients and administering treatment while earning less than minimum wage. The common throughline irrespective of insurance policy, is that defendants' facilities operate to make the maximum profit at the

---

[3] See, e.g., https://www.ocregister.com/2025/05/30/rampant-drug-use-at-addiction-rehabs-led-to-deaths-complaints-claim/ (describing two overdose death allegations for patients at the defendant's facilities).

expense of patient safety and welfare. Defendants' indifference to patient harm was demonstrated time and time again. Illustratively, when patients' insurance policies stopped reimbursing the defendants for treatment, patients were tossed out on the street with no resources or bridge treatment. Many overdosed or became homeless.

The danger defendants pose to the community is also documented in police reports and contemporaneous reporting in various news outlets. Huntington Beach Police Department record logs of calls for service at approximately 24 Young Facilities from April 28, 2022, to February 2026, show a recurring pattern of overdoses, violent assaults, suicides, and drug use within the Young Facilities. (Suhr Decl. Ex. C.) Moreover, the logs corroborate the defendants' pattern of casting patients out into the street without referral to other services. Id. For example, one service call to a Young Facility on January 25, 2023, indicates that a 20-year-old woman was overdosing on Trazodone. Id. at 2. Another service call log reads: "19 YO OD's on her psych meds[4]," another, "RP wants to talk to police..stating that people keep dying there[5]," another, "house manager of this sober living was very 415, poss hbd, and denied this incident occured trying to verbally prevent us from going inside. Other occupants confirmed subj having medical emergency so entry was made." Id. at 18.

The government has also reviewed police records relating to various overdose deaths at the Young Facilities. For example, one police report describes a call for service on February 8, 2023, in response to a report of an overdose at a Young Facility. Id. at 17.

---

[4] Id. at 7.

[5] Id. at 16.

The narrative account of the responding officer reports that a female patient, M.F., of the Young Facilities was found non-responsive at the Young Facility with drugs and paraphernalia around her. Id. The house manager who found her, who is also known to the investigation as a patient of the Young Facilities, tried to resuscitate M.F. with Narcan, but was unsuccessful and M.F. sadly died. Id.

The YOUNGs have not been deterred by other legal process. Despite being inundated with numerous reports and lawsuits filed by patients, former employees, and California state agencies detailing their malfeasance, the YOUNGs have continued to perpetuate their fraud scheme, which has harmed patients across the country. In fact, in June 2024, the Delaware Department of Health and Social Services' Overdose Response Center issued a "Scam Alert," specifically warning patients about a Young Facility, Santa Monica Rehab:

Delaware Department of Health and Social Services (DHSS)
June 7, 2024

The Division of Substance Abuse and Mental Health's Overdose Response Center is warning of a scam in our area involving individuals claiming to be part of residential rehabilitation programs in California, such as Santa Monica Rehab of California. The claims of residential treatment services and ongoing treatment in California are likely FALSE CLAIMS. Beware of body brokering, cash offers, kickbacks, and insurance fraud. For addiction treatment resources you can trust, visit the Treatment Connection website at www.treatmentconnection.com or scan the QR code in the graphic below. The facilities on this site have been reviewed and validated by the state government where they are located.




Neither have they been deterred by extensive local and national[6] reporting describing the suffering that they have left in their wake. Illustratively, a July 8, 2026, Orange County Register article describes patients who died on the YOUNGs watch, including patient M.D. (Suhr Decl. Ex. D at 5-7.). According to the article, and corroborated by Young Facility records, M.D. was brokered from Illinois to Los Angeles to a Young Facility where she was prescribed medically unnecessary opioid medications to which she developed a dependence. After M.D.'s insurance failed to reimburse, she was

[6] See, e.g., https://www.wsj.com/us-news/drug-rehabs-insurance-curbing-6c56ded6.

summarily thrown out into the street where she suffered a fatal overdose. The article goes on to describe several other patients who died at the Young Facilities. One lawsuit filed on behalf of a deceased patient writes that the YOUNGs acted "to inject decedent into a body brokering racket under the care and custody of a group of unqualified tortfeasors who wanted and/or allowed (his) relapse, so that he could start the insurance billing cycle from square one." That pattern is fully corroborated by claims data, interviews of former patients and employees, internal Young Facility records, communications between the YOUNGs and their employees, and prescribing records.

In addition to causing physical and psychological harm to patients, the defendants are an economic danger. To date, defendants have generated over $210 million in fraudulent proceeds from the scheme, which is ongoing. Defendants continue to open and operate substance abuse treatment facilities and bill private insurance companies for substandard or non-existent treatment. Financial fraud of this nature is a recognized danger to the community. See United States v. Reynolds, 956 F.2d 192, 193 (9th Cir. 1992) (recognizing that "danger to the community" under 18 U.S.C. § 3143(b) includes the risk of pecuniary or economic harm).

The YOUNGs present an ongoing and very real threat to the community. They continue to operate and open new substance abuse treatment facilities throughout California and across the country, showing that the YOUNGS can continue to perpetuate massive fraud and endanger people from the comfort of their own homes. Indeed, as recently as April, defendant NATHAN YOUNG directed a former Young

Facility employee to open another detox facility in Pennsylvania under the employee's name.

Recent text messages seized from a co-conspirator patient broker's cell phone illustrate this ongoing threat. In a series of texts from May of this year, NATHAN YOUNG is directing the broker's travel, approving expenditures, sending money, and referencing the operation of the Intensive Outpatient Programs ("IOPs") and sober homes. This demonstrates the YOUNGS are continuing to use same brokers to recruit patients to sober homes and IOPs that they operate around the country and using the co-conspirators as nominee owners. In the below top left message, the co-conspirator patient broker sends PABLO an image taken of what appears to be a roadside homeless encampment. She writes, **"that black suv is one of ours loading people up whoot whoo…if you're looking for a bed and a roof I've got options lol."**












Defendants not only caused economic harm for insurance companies, they also defrauded patients and the government. With respect to the former, although defendants promised patients that they would handle insurance premium payments and co-pays, they did not always do so. Therefore, after leaving the Young Facilities, many patients were shocked to find themselves on the hook for thousands of dollars in unpaid premiums that they could not afford. Central to defendants' scheme was also defrauding taxpayers. By fraudulently enrolling hundreds, if not thousands, of patients in Affordable Care Act Plans that they were ineligible for, defendants caused the U.S. Treasury to pay premium tax credit subsidies, basically money to cover the cost of insurance premiums, that they would not have paid knowing that the enrollments were fraudulent. Further, unwilling to even feed patients whose insurance they were billing for thousands of dollars per day, defendants caused patients to fraudulently enroll in government food assistance programs that they were not eligible for.

Releasing the defendants will therefore put the physical and economic safety of the community at risk.

**C. Defendants Are a Flight Risk**

1. Defendants Are Deliberately Hiding Their Wealth

After the YOUNGS became aware of the government's investigation, they made extensive efforts to hide their wealth and involvement in the ongoing fraud scheme by opening over a dozen substance abuse treatment facilities and other companies in the names of nominees, including many under the names of known co-conspirators. The YOUNGS hide their involvement by transferring their companies to employees

and family members and directing them to authorize administrative bank accounts that NATHAN YOUNG has 100% control over.

As of March 2025, defendants held at least 18 of the Young Facilities under the names of nominee owners, including uncharged co-conspirators in the health care fraud scheme. To effectuate this deception, defendants created fraudulent conveyance documents and caused paperwork to be filed with financial institutions and state regulators that falsely characterize the nominees as the true owners. For example, throughout 2025 defendants opened several administrative bank accounts for Young Facilities and directed nominee owners -- including uncharged co-conspirators in the health care fraud scheme -- to execute agreements authorizing defendant NATHAN YOUNG to open up and have "100% control over the account." (Suhr Decl. Exs. E, F.).

In early December 2025, the Orange County Register published another article[7] regarding a federal criminal investigation into the Young Facilities. A few weeks later, defendant DAVID YOUNG emailed defendant NATHAN YOUNG the results of a Chat GPT response to a question regarding conduct that does not constitute health care fraud as well as questions about the circumstances in which an insurance company can sue for fraudulent claims. In late December 2025, the YOUNGS transferred approximately $9.2 million from various nominee accounts for the Young Facilities to a business owned and controlled by NATHAN YOUNG. A majority of these funds were insurance proceeds from private insurance companies. Bank surveillance captures NATHAN YOUNG and a nominee owner conducting the transactions.

---

[7] https://www.ocregister.com/2025/12/03/rehab-riviera-addiction-treatment-empire-faces-criminal-probe/

Over the past year, defendants have ramped up their efforts to conceal assets. In March of this year, the YOUNGS purported to convey 13 Young Facilities as a "gift" to a charity. See Suhr Decl. Ex. G. However, this "charitable gift" is entirely fraudulent; the "charity" is actually another Young Facility owned by a Young Facility employee and nominee owner who the YOUNGs have been using to conceal the transfer of millions of dollars using administrative accounts. Specifically, in December 2024, an account was opened at Bank of America for a company, MMC[8], owned by the same nominee owner. However, when that account was opened, emails show that defendant DAVID YOUNG submitted to BOA an agreement signed by the nominee owner, which gave NATHAN YOUNG 100% ownership of an administrative account for MMC. That account has since transferred over $11 million to another account owned by a Young Facility employee, and as recently as May 2026, following the charitable "transfer," the account transferred over $1.3 million to an account owned and controlled by NATHAN YOUNG.

In March of this year, defendant DAVID YOUNG emailed defendant NATHAN YOUNG what appears to be a ChatGPT response to a question regarding bank disclosure obligations regarding administrative bank accounts. In the email in which defendant DAVID YOUNG highlighted certain passages, including: **"What would actually allow cross-institution lookup: A court order or subpoena – compels specific banks to disclose account information."** Just over a week later, defendant NATHAN YOUNG executed the false charity agreement.

---

[8] To anonymize this entity, the government has provided only the first initials of the company name.

Per information from Bank of America current as of October 14, 2026, NATHAN has millions of dollars in accounts owned or controlled by him, including $1.8 million in an account nominally owned by an employee and on which NATHAN is the signer. (Suhr Decl. Ex. I) Further, per an analysis conducted by IRS-CI Special Agent Clayton Flacker, NATHAN has demonstrated a pattern of high-dollar cash withdrawals, making it impossible to determine, or trace, the full extent of his wealth and giving him ample means to flee in ways that are not traceable by the government. Id.

Moreover, at the execution of a search warrant on defendant DAVID YOUNG's home on October 13, 2026, the government found further evidence of the YOUNGs' use of a sprawling network of entities and nominees to hide their wealth. (Suhr Decl. Ex. J) As noted in Special Agent Flacker's report, agents found multiple checkbooks belonging to different entities, pre-signed checks, and credit cards in the names of nominees. Id.

Because defendants have taken extensive measures to hide their wealth in a sprawling network of nominee owners and shell entities around the country, they have the ability to use the large amount of money they have generated from the scheme to flee the country.

Not only did defendants NATHAN YOUNG and DAVID YOUNG create false paperwork, but NATHAN YOUNG lied about their continuing ownership of various substance abuse treatment facilities in a sworn deposition taken in lawsuit brought by Aetna against the YOUNGS.[9] In his deposition testimony in the Aetna case on December 18, 2025,

---

[9] Aetna sued NATHAN YOUNG, DAVID YOUNG, and numerous Young Facilities in a civil lawsuit alleging fraud, RICO conspiracy, and RICO. See Aetna Life Insurance Company et al v. Nathan Young, et al., 2:23-CV-09654-MCS-SK.

defendant YOUNG stated that co-conspirator H.P. was the true owner of Reclaiming My Path, an umbrella entity that controls various sober living facilities around the country. See Suhr Decl. Ex. B. In fact, defendant NATHAN YOUNG is the true owner of Reclaiming My Path and H.P. was an employee who was merely made to be the owner on paper. Id. Moreover, defendant NATHAN YOUNG stated that he was in the process of donating his treatment facilities to "charity." In fact, as set forth above defendants NATHAN YOUNG and DAVID YOUNG caused the facilities to be transferred to an employee under a false conveyance document while remaining wholly controlled by them so that the YOUNGS could continue to conceal insurance proceeds. Having already shown a willingness to mislead while under oath, NATHAN YOUNG has demonstrated that he is unable to abide by the orders of this Court and that any protests to the contrary are not credible. Further, both defendants' systematic and extensive pattern of lies to regulators and others demonstrate that they will not follow the law while on release.

The YOUNGS' access to concealed financial channels, coupled with their demonstrated willingness to continue a billion-dollar fraud scheme under nominee owners, confirms that they pose both a danger to the community and a significant risk of flight that cannot be mitigated by bond conditions.

2. Defendants Have a Strong Incentive to Flee Because They Are Facing a Life Sentence in Prison

Defendants' guidelines range of life imprisonment together with the overwhelming nature of the evidence against them create a strong incentive to flee. The below conservative Guidelines calculation lays out what defendants are facing, at minimum:

**Guidelines Calculation:**

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| Loss over $550,000,000[10]: | +30 | U.S.S.G. § 2B1.1(b)(1)(P) |
| Multiple victims: | +2 | U.S.S.G. § 3A1.1(b)(2) |
| Vulnerable victims: | +2 | U.S.S.G. § 3A1.1(b)(1) |
| Sophisticated means: | +2 | U.S.S.G. § 2B1.1(b)(10)(C) |
| Total: | 43, or life | |

At sentencing, the government will also seek to apply a four-point enhancement for Aggravated Role.

The defendants' prospective sentence provides an even greater incentive to flee in the context of the government's strong evidence against them. For instance, the government possesses internal communications between the defendants and other co-conspirators showing NATHAN YOUNG and DAVID YOUNG describing and directing the scheme. It further has the witness statements of dozens of former employees and patients who confirm the governments' account of the scheme and are themselves corroborated by contemporaneous records, including bank records, checks, text messages, medical records, and claims data.

The likelihood of a significant sentence provides defendant an incentive to flee. See United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) ("[c]onsideration of the nature of the offenses charged involves consideration of the penalties"); United States v. Possino, No. CR 13-00048, 2013 WL 1415108, at *4 (C.D. Cal. Apr. 8, 2013) ("The weight of the evidence against [defendant] is strong.

[10] The calculated loss amount of approximately $1.3 billion considers only the claims billed to certain private insurers by a subset of defendants' treatment facilities and is therefore conservative.

Defendant's awareness of a potentially lengthy prison sentence and the perception of a likely conviction constitute powerful motivations to flee."). These factors weigh towards defendant's detention. See United States v. Al-Arian, 280 F. Supp. 2d 1345, 1358 (M.D. Fla. 2003) ("the stronger the government's case, especially if the sentence will be severe, the greater a defendant's incentive to flee").

Defendants have no criminal history and live a comfortable life financed by their fraud scheme. This lifestyle has not prepared them for the prospect of a lengthy criminal sentence. Moreover, defendants have strong ties to Israel, with NATHAN YOUNG reportedly serving as a combat soldier in the Israeli Defense Forces for two years.

Just three days ago, on October 10, 2026, DAVID YOUNG purchased a roundtrip ticket for himself and his wife to Tel Aviv, Israel intended to depart on October 13 and return to Los Angeles on October 29. DAVID YOUNG's decision to book an international flight with 72 hours' notice, after no travel to Israel for 8 years, itself raises concerns, but is even more suspect in light of its timing. DAVID YOUNG purchased the tickets just two days after the government filed a notice of manual filing on the public, CDCA docket of a co-conspirator and former employee of the Young Facilities, seeking to file documents under seal. The co-conspirator had been charged with similar conduct: including, among other things, illegal remunerations for referrals to clinical treatment facilities, and conspiracy. Although the notice of manual filing did not disclose why the documents needed to be under seal, it takes little imagination to guess what was so sensitive that the government sought to seal it

without even publicly disclosing the reason for sealing. This is especially not a difficult guess for defendants, who, like the YOUNGS, are so savvy and sophisticated to have already researched how they can best avoid being charged for health care fraud.

Thus, having the place to go, the means, and the motive, defendants will not hesitate to flee if given the opportunity.

3. <u>During Execution of a Federal Search Warrant, It Appears DAVID YOUNG Attempted to Destroy Evidence</u>

As noted above, on October 13, 2026, law enforcement executed a search warrant at DAVID's residence located at 1158 Daniels Dr., Los Angeles, California. (Suhr Decl. Ex. H.). Law enforcement breached the premises after DAVID refused to answer the door. As set forth in the attached report by IRS-CI Special Agent Clayton Flacker, after entering the premises, law enforcement instructed DAVID and his wife to exit a room in the back of the residence. <u>Id</u>. During the search of the room that DAVID exited, investigators located a Samsung Galaxy cell phone associated with telephone number (310) 343-8684, which Verizon subscriber records as of June 2026 confirm is associated with DAVID and his wife. <u>Id</u>. Law enforcement observed that the phone's screen was blue and said "downloading" on the top portion of the screen. Upon review of the phone, agents from FBI's Computer Analysis Response Team ("CART") concluded that the phone was in a "refresh state". <u>Id</u>. Approximately 20 minutes after law enforcement located DAVID YOUNG's phone, the battery died. <u>Id</u>. According to CART, a "refresh state" can be manually activated by a user to delete data from the device or reset the device to factory settings, and the "refresh state" uses battery at a higher rate than normal causing the phone's battery to die faster than under normal use circumstances.

Id. Based on the battery life of the phone while in a "refresh state", CART concluded the phone was manually placed into a refresh state the morning the search warrant was executed at his residence. Id. DAVID's conduct is a prime example of the YOUNGs willingness to disobey law enforcement and obstruct justice.

4. Release Conditions Will Not Mitigate the YOUNGs Danger or Risk of Flight

Even if defendants propose a secured bond worth millions of dollars and release conditions such as home detention and electronic monitoring, these conditions will not mitigate defendant's danger to the community. See, e.g., United States v. Rodriguez, 950 F.2d 85, 89 (2d Cir. 1991) (noting a "security bond, cosigned by two financially responsible persons, strict pretrial service agency supervision and restriction of travel" and the "existence of four cosigners and $10,000 cash may assure the appearance of [Defendant] at trial but will not secure the safety of the community."; see also S. Rep. No. 225, 98th Congress, 1st Sess. 1983, 1984 U.S.C.A.N. 3182, 3198-99 (n.60) (Congress finding that "a defendant who is a danger to the community remains dangerous even if he has posted a substantial money bond").

Electronic monitoring would also be of little consequence when compared to the significant incentive that defendants have to flee. See United States v. Megahed, 519 F. Supp. 2d. 1241, 1244 (M.D. Fla. 2007) ("Neither electronic monitoring nor the GPS system of surveillance defeats the resolute, resourceful, energetic, and non-compliant releasee."). Defendants could remove their location monitoring, obtain a fake passport, and flee to another country through Canada or Mexico. See, e.g., United States v. Ayvazyan et

al., 20-CR-579-SVW (C.D. Cal.), Dkt. 1230 at 3-4 (describing defendant who surrendered passport and on location monitoring who removed his location monitoring bracelet and absconded)[11]; see also United States v. Mercedes, 254 F.3d 433, 437 (2d Cir. 2001) (reversing grant of pre-trial release noting that home detention, family assurances, and electronic monitoring not sufficient in face of strong evidence that defendant presented flight risk and danger to community).

Further, any arguments that defendants have strong ties to the Central District of California or supportive family members does not mitigate defendants' danger or assure defendants' appearance at future hearings. Defendants have demonstrated that they cannot follow Court orders and obey the law and that they will continue to engage in fraud from the comfort of their own homes, through various nominees. This is particularly the case here where defendants' own family members are implicated in the fraud.

**III. CONCLUSION**

Defendants have demonstrated that they are a present and continuing danger to the community and risk of flight. Even a significant secured bond, home detention, and location monitoring will not protect the community from defendants' fraud scheme. Defendants' savvy attempts to hide their ongoing criminal conduct and wealth shows they will not hesitate to flee when facing up to a life

---

[11] Defendant Richard Ayvazyan successfully fled to Montenegro despite having surrendered his passport and being on location monitoring. See https://www.justice.gov/usao-cdca/pr/former-san-fernando-valley-couple-extradited-united-states-montenegro-begin-prison.

sentence. Accordingly, the government respectfully requests that the Court order defendants detained.

**DECLARATION OF ERIKA V. SUHR**

I, Erika V. Suhr, declare as follows:

1. I am a Trial Attorney in the U.S. Department of Justice, National Fraud Enforcement Division, Health Care Fraud Section. I represent the government in this matter, in which the government is moving for the detention of Defendants NATHAN YOUNG ("NATHAN") and DAVID YOUNG ("DAVID") (together "the YOUNGs").

2. The government obtained federal search warrants for email accounts used by DAVID and NATHAN. **Exhibit A** is a true and correct copy of an email exchange between DAVID and NATHAN and a Young Facility employee discussing a list of Young Facilities around the country that were being "assigned" to various nominee owners, including the individuals referred to in the complaint as Broker 1, Broker 2, and Cooperating Witness 1.

3. The government obtained records from Aetna from its civil lawsuit against NATHAN, DAVID, and others. NATHAN gave a deposition, under oath, in that case, during which he spoke about the ownership of some of the Young Facilities, including that he was donating some of them to charity. **Exhibit B** is a true and correct excerpt of NATHAN's deposition testimony transcript in that case.

1. The government obtained Huntington Beach Police Department record logs of calls for service at approximately 24 Young Facilities from April 28, 2022, to February 2026. **Exhibit C** is a true and correct copy of a portion of those records. The call logs reference overdoses, violent assaults, suicides, and drug use within the Young Facilities. For example, one service call to a Young Facility on January 25, 2023, indicates that a 20-year-old woman was overdosing on Trazodone. Id. at 2. Another service call log reads: "19 YO OD's

on her psych meds," another, "RP wants to talk to police..stating that people keep dying there," another, "house manager of this sober living was very 415, poss hbd, and denied this incident occured trying to verbally prevent us from going inside. Other occupants confirmed subj having medical emergency so entry was made." Id. at 18.

4. **Exhibit D** is a true and correct copy of a July 8, 2026 Orange County Register article describing patients who died under the care of the Young Facilities. The article references a patient, M.D., who was brokered from Illinois to Los Angeles to a Young Facility where she was prescribed medically unnecessary opioid medications to which she developed a dependence. Ex. D at 5-7. After M.D.'s insurance failed to reimburse, she was summarily thrown out into the street where she suffered a fatal overdose. The article goes on to describe several other patients who died at the Young Facilities. Id. One lawsuit filed on behalf of a deceased patient writes that the YOUNGs acted "to inject decedent into a body brokering racket under the care and custody of a group of unqualified tortfeasors who wanted and/or allowed (his) relapse, so that he could start the insurance billing cycle from square one." Id.

5. **Exhibit E** is a true and correct copy of an email obtained via search warrant wherein, on May 19, 2025, defendant DAVID YOUNG carbon copied NATHAN YOUNG, and emailed a Bank of America employee to request the employee open an administrative bank account for a Young Facility, Vital Steps Recovery LLC (held in the name of a nominee owner, that is, Broker 2.) **Exhibit F** is a true and correct copy of a February 21, 2025 agreement titled, "Resolution of Vital Steps Recovery LLC" found in the email search warrant production, wherein

Broker 2 agreed that NATHAN YOUNG "can open an administrative account for Vital Steps Recovery LLC. Nathan Young can have 100% control over the account."

6. **Exhibit G** is a true and correct copy of a letter obtained from the search warrant production, which was addressed to NATHAN YOUNG and signed by an employee and nominee of the Young Facilities. The letter identifies this employee as the "Chair of the Board" of Ocean View Recovery. In the letter, the employee purported to acknowledge NATHAN YOUNG's "irrevocable charitable gift of ownership interests" to Ocean View Recovery. The purported charitable gifts include 16 Young Facilities.

7. On October 13, 2026, law enforcement, including Special Agents with IRS-CI, executed search warrants at DAVID's residence. **Exhibit H** is a true and correct copy of a report written by IRS-CI Special Agent Clayton Flacker regarding what law enforcement witnessed in the lead up to seizing DAVID's telephone.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on October 14, 2026.

8. On October 14, 2026, Special Agent Clayton Flacker spoke with a Bank of America analyst to obtain information regarding several accounts associated with NATHAN. **Exhibit I** is a true and correct copy of a report written by SA Flacker about the conversation.

9. **Exhibit J** is a true and correct copy of a report by Special Agent Flacker regarding items found at DAVID's home pursuant to the October 13, 2026 search warrant execution.

/s/
ERIKA V. SUHR